ESTATE OF BENJAMIN LOWENSTEIN, DECEASED, LEO LOWENSTEIN AND HARRY GROEDEL, EXECUTORS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 111414, 104543. Promulgated July 21, 1944.

*Mark Eisner, Esq.,* for the petitioners.
*J. Richard Riggles, Jr., Esq.,* for the respondent.

ARNOLD, *Judge*: These consolidated proceedings involve deficiencies in income tax of decedent Benjamin Lowenstein as follows:

| | |
|---|---|
| Docket No. 111414, 1936 | $62, 507. 91 |
| Do 1938 | 51, 165. 30 |
| Docket No. 104543, 1937 | 8, 479. 69 |

In Docket No. 104543 the respondent disallowed a deduction claimed by decedent for commissions paid by him on the sale of securities and commodities and determined a deficiency of $8,479.69 for 1937. In his answer respondent claims an increased deficiency of $73,326.51 on the theory that the income of three trusts created by decedent for his children was taxable to him. In Docket No. 111414 deficiencies for 1936 and 1938 were determined by including in decedent's income the income of the aforementioned trusts for those years.

The cases were submitted upon a stipulation of facts, together with exhibits attached thereto. We adopt the facts as stipulated as our findings of fact herein. In so far as material to the issues presented, they are substantially as follows:

Benjamin Lowenstein, hereinafter called decedent, died on or about August 15, 1941, leaving a last will and testament which was duly admitted to probate in the Surrogate's Court, County of New York, on or about September 17, 1941. The will named Leo Lowenstein and Harry Groedel as executors. They duly qualified as such and letters testamentary were issued to them on or about September 18, 1941. Decedent filed his income tax returns for the years in question with the collector for the third district of New York.

On June 11, 1930, decedent executed in New York three indentures respectively designated as "declarations of trust," one for the benefit of his son, Leo Lowenstein, as life beneficiary; one for the benefit of his daughter, Doretta Wallace, as life beneficiary; and one for the benefit of his daughter, Carrie L. Groedel, as life beneficiary. Leo Lowenstein was born September 4, 1887, and on June 11, 1930, had been married and divorced and was then living in New York City. Doretta Wallace was born September 22, 1888, and on June 11, 1930, was married and living with her husband and five children in Brookline, Massachusetts. Carrie L. Groedel was born February 26, 1892, and on June 11, 1930, was married and living with her husband and two children in Deal, New Jersey. The three trust instruments contain substantially the same provisions, in so far as here material. In each, decedent is named as original trustee and provision is made for successor trustees in case of his death or resignation. In each trust indenture Benjamin Lowenstein declares property described as:

Promissory note of Wallau Realty Co., Inc., dated June 11, 1930, payable on demand, with interest at 2% per annum, endorsed to the order of Benjamin

Lowenstein as trustee of the trust created for  *  *  *  by declaration of trust dated June 11, 1930.

is held in trust by him and will continue to be held by him in trust. In each trust it is provided that upon the death of the designated life beneficiary the principal is payable to the lawful issue of such beneficiary. If no issue survive, then to the issue then living of Benjamin Lowenstein, share and share alike per stirpes and not per capita. In the Leo Lowenstein trust upon his death the principal is payable to his sister, Doretta Wallace, if living, and if she be not then living, to her issue surviving her, and if no issue survive her, then to the issue of Benjamin Lowenstein, as in the other trusts. Other material provisions of the instruments, as typified by those of the Doretta Wallace trust, are as follows:

1. The trustee shall hold the said property as a trust fund and shall manage, invest, reinvest and keep the same invested and shall pay the net issues, income and profits thereof to Doretta Wallace, daughter of the said Benjamin Lowenstein during her natural life.

2. Upon the death of the said Doretta Wallace the trustee shall divide the principal of the trust fund then in his hands into as many equal parts or shares as shall equal the number of the said Doretta Wallace's children then living and of her children then dead leaving lawful issue then living. If said Doretta Wallace shall leave no issue her surviving the principal of the trust shall upon her death be paid share and share alike, per stirpes and not per capita, to the issue then living of said Benjamin Lowenstein.

*        *        *        *        *        *        *

9. The original trustee, Benjamin Lowenstein, is authorized to invest and reinvest the principal of said trust in any manner whatsoever in his sole discretion, including any form of investment not authorized by law, including, without limiting the generality of the foregoing, any stock, bond, mortgage, business loan, debt or claim, secured or unsecured, whether or not income producing and whether or not speculative, and any loss that shall result from such investment shall be borne by the principal of the said fund and shall not be chargeable in any manner to him.

10. Any trustee hereunder is authorized to sell, exchange, mortgage, lease or otherwise dispose of the whole or any part of the principal fund whether real, personal or mixed, at public or private sale and upon such terms and conditions as to the trustee may seem proper, and to execute and deliver any and all instruments necessary or proper to carry out such powers. The original trustee, Benjamin Lowenstein, is authorized and empowered to acquire in his individual capacity, the whole or any part of the said fund upon such sale, exchange, mortgage, lease or other disposition; and such transactions shall not be invalidated or affected in any way or to any extent by reason of the fact that he may be acting in both representative and individual capacities.

11. Any trustee shall have the right to permit any part of the said fund to remain invested as long as he may deem fit in any form of investment in which the same shall be invested at the time that the fund is received by him as trustee.

*        *        *        *        *        *        *

13. For greater convenience the several trusts hereinbefore created may be kept collectively in one or more funds by any trustee.

14. Any trustee hereunder is authorized in his sole discretion and as he may elect in making division or divisions or distribution or distributions at any and all times, whether such division or distribution be preliminary, partial or final, or for the purpose of allotting, setting apart or setting up one or more of the trusts herein created, to make such distribution wholly or partly in specie or kind and at such valuations of each piece or portion thereof as he shall think just, without the necessity or obligation of converting the whole or any part of the trust fund into cash and without requiring the consent, authority or direction so to do of any beneficiary and without requiring the consent of any Court; and such trustee is authorized to put such valuations on the same as he shall consider just and fair and such distributions, allotments and valuations shall be final and conclusive and binding upon the parties interested hereunder.

\*      \*      \*      \*      \*      \*      \*

16. All income accrued on any securities hereunder at this time and all income accrued on any additional securities or property which the said Benjamin Lowenstein may add to the principal of this trust, shall be treated as income hereunder and distributed as such.

17. Any trustee is hereby authorized and empowered in his discretion, to vote in person or by proxy upon all stocks or other securities held by him as such; to deposit any of the securities at any time forming part of the trust fund herein under any plan or plans of reorganization that may commend themselves to his good judgment and to accept the new securities which may be offered under such plan or plans in exchange for such original securities and to pay any and all assessments levied or imposed under such plan or plans of reorganization and to charge the amount thereof against the principal of said trust fund; to enter into such voting trust agreements as he may deem proper and to accept voting trust certificates in exchange for stock certificates; to exchange the securities of any corporation or company for other securities issued by the same, or by any other corporation or company at such times and upon such terms and conditions as he shall deem proper; to consent to the reorganization, consolidation or merger of any corporation or company or to the sale or lease of its property or any portion thereof, to any person, corporation or company or to the lease of any person, corporation or company of his or its property or any portion thereof to such corporation or company, and upon such reorganization, consolidation, merger, sale or lease, to exchange the securities held by it for the securities issued in connection therewith; to pay all assessments, subscriptions and other sums of money as said trustee may deem expedient for the protection of his interest as holder of any stocks, bonds or securities of any corporation or company and to exercise any option contained in any stocks, bonds or other securities for the conversion of the same into other securities or to take advantage of any rights to subscribe for additional stocks, bonds or other securities and to make any and all necessary payments therefor and generally to exercise with respect to all stocks, bonds or other investments held by said trustee, all rights, powers and privileges as are or may be lawfully exercised by any person owning similar property in his own right.

18. Any trustee may at his option transfer and hold, but at his risk, any corporate securities hereunder in the name of a nominee instead of in the name of himself as trustee, or in his own name without adding words showing his fiduciary capacity.

19. Said Benjamin Lowenstein shall have the right at any time and from time to time during the continuance of the trust hereby created to assign, transfer, deliver or deposit with any trustee hereunder additional securities or property which thereupon shall become a part of the trust estate and pledged in every respect to the trust and the terms and conditions of this instrument.

Decedent did not resign as trustee of the three trusts during his lifetime and he acted as sole trustee during the years 1936, 1937, and 1938. All of the income of the trusts received by the trustee during those years was distributed to the respective beneficiaries, and fiduciary returns were filed. The current cash funds of the three trusts were kept in a separate bank account under the name of "Benjamin Lowenstein Special," and no other funds were placed in this bank account. The income of each of the three trusts for 1937 was $39,456.28, which item includes the sum of $421.43 of partially tax-exempt income, the same being interest on United States savings bonds and Treasury bonds.

At the time of the creation of the trusts the Wallau Realty Co., maker of the notes described in the respective indentures, was a New York corporation. Its issued and outstanding stock was owned by Benjamin Lowenstein, Leo Lowenstein, Doretta Wallace, and Carrie L. Groedel, each the one-fourth part thereof. In 1931 the New York corporation was dissolved and all its assets were transferred to the Wallau Corporation, a newly created Delaware corporation, which assumed all the liabilities of the New York corporation, including the aforesaid notes. All the issued and outstanding stock of the Delaware corporation was owned by Leo Lowenstein, Doretta Wallace, and Carrie L. Groedel, each the one-third part thereof.

Decedent paid during 1937 commissions in the amount of $17,207.07 on the sale by him of securities and commodities.

Each of the trusts created by the decedent was a genuine, valid, subsisting trust. No power of revocation was retained and the broad powers of management and control granted to the trustee were for the benefit of the trust beneficiaries and not for the purpose of revesting in the grantor title to any part of the trust corpus.

Respondent included the income of the three trusts in Benjamin Lowenstein's income for 1936 and 1938 upon the theory that sections 166 and 22 (a) of the Revenue Acts of 1936 and 1938 [1] authorized such

---

[1] SEC. 166. REVOCABLE TRUSTS.

Where at any time the power to revest in the grantor title to any part of the corpus of the trust is vested—

    (1) in the grantor, either alone or in conjunction with any person not having a substantial adverse interest in the disposition of such part of the corpus or the income therefrom, or

  *       *       *       *       *       *       *

then the income of such part of the trust shall be included in computing the net income of the grantor.

SEC. 22. GROSS INCOME.

    (a) GENERAL DEFINITION.—"Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal service, of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *

inclusion therein. He seeks to include the income of the three trusts in Benjamin Lowenstein's income for 1937 upon the same theory. No question is presented herein with respect to section 167 of those acts.

We shall consider first whether section 166 applies. Respondent does not contend that the grantor retained an express power to revoke the trusts, nor is any such express power contained in the indentures. He contends that the power of the grantor, as original trustee, "to invest and reinvest the principal of said trust in any manner whatsoever in his sole discretion" in secured or unsecured property, whether or not speculative or income producing, without any loss therefrom being chargeable to him, as trustee, was substantially equivalent to the power to revoke the trust. Respondent buttresses his contention with the additional powers granted the trustee by paragraphs 17 and 18 of the indentures hereinabove set forth, and cites numerous authorities dealing with the taxation of trust income to the grantor under section 166.[2]

Some of the cited cases lend weight to respondent's argument, but a comparative analysis of this case with the authorities cited by both parties convinces us that respondent is in error. Respondent asserts that the present trust indentures had strikingly similar provisions to the trust in the *Chandler* case, *supra* (footnote 2). Chandler, however, specifically reserved the power to direct the trustee to buy from or sell to himself, as grantor, at prices fixed by him. The Board held and the court agreed that the power reserved by Chandler was *for his own benefit* and amounted to the right to revoke the trust. Such a holding brought section 166 of the Revenue Act of 1934 into play and the trust income was taxed to Chandler.

Here Lowenstein's authority to act under the trusts was as trustee, not as grantor or donor. The trusts were created for the benefit of his children and their issue and not for any benefit that he could personally derive therefrom. The trusts irrevocably disposed of the trust income and trust corpus to his children and their descendants. The powers granted the trustees, original and successor, were designed to aid the fiduciary in the management and investment of the trust corpora for the benefit of the grantor's children. No powers were reserved by the grantor whereby he could revoke the trust or revest any part of the trust corpora or income in himself. Any attempt by the trustee to use his fiduciary powers for his individual benefit, as grantor, or to mulct the trusts or waste their assets for his personal advantage, would violate the trusts and would be prohibited by New York law.

---

[2] *Chandler* v. *Commissioner* (C. C. A., 3d Cir.), 119 Fed. (2d) 623, affirming 41 B. T. A. 165; *David M. Heyman,* 44 B. T. A. 1009; now on appeal, C. C. A., 2d Cir.; *Commissioner* v. *Buck* (C. C. A., 2d Cir.), 120 Fed. (2d) 775, reversing, on this point, 41 B. T. A. 99; *George H. Whiteley, Jr.,* 42 B. T. A. 402: affd. (C. C. A., 3d Cir.), 120 Fed. (2d) 782; certiorari denied, 314 U. S. 657; *William J. Garland,* 42 B. T. A. 324; *Frank G. Hoover,* 42 B. T. A. 786.

*Carrier* v. *Carrier*, 226 N. Y. 114; 123 N. E. 135; *Heyman* v. *Heyman*, 33 N. Y. S. (2d) 235; *Osborn* v. *Bankers Trust Co.*, 5 N. Y. S. (2d) 211.

In the *Carrier* case, *supra*, the New York Court of Appeals, speaking through Judge Cardoza, used language equally apt to the present facts, viz:

* * * It is true that the creator of this trust had reserved to himself the broadest rights of management. His discretion was to be "absolute and uncontrolled." That does not mean, however, that it might be recklessly or willfully abused. He had made himself a trustee; and in so doing he had subjected himself to those obligations of fidelity and diligence that attach to the office of trustee. He had power to "invest" the moneys committed to his care. He had no power, under cover of an investment, to loan them to himself. His discretion, however broad, did not relieve him from obedience to the great principles of equity which are the life of every trust. * * *

In *David M. Heyman*, *supra*, which is factually distinguishable from the present case, the Board held, upon authority of the *Chandler* case, *supra*, that the powers retained by the grantor-trustee in a trust for the benefit of his wife permitted him to revest any part or all of the trust corpus in himself. The trust income was accordingly taxable to the grantor under either section 166, or section 22 (a). Trust income for his minor children was held taxable to Heyman under section 22 (a). After the Board's decision the trust indenture was construed by the New York Supreme Court in *Heyman* v. *Heyman*, *supra*. The New York court was specifically asked whether the grantor-trustee could legally acquire assets from the trust below their real value or sell property to the trust in excess of market value. The court held that the grant of the widest possible investment powers to the trustee, including the right to enter into speculative transactions, clearly does not authorize the trustee to use the trust assets for his own benefit, to act in bad faith, or to recklessly waste them; that, in the absence of a provision in the indenture permitting the trustee to deal with his own trust, such transactions must be summarily avoided, but where the trust instrument grants the power to the trustee to deal with himself, "he is bound to exercise this power in the best of faith and to evince the highest degree of disinterestedness, loyalty and honor"; that, whether viewed in the light of trust powers reserved to himself as grantor, or granted to himself as trustee, the result is identical under New York law; that, no matter how broad the exculpatory clause, a court of equity will not afford protection to trustees who deliberately seek to pillage or destroy a trust, and that, therefore, a trustee could not legally acquire trust assets below their real value or sell property to the trust in excess of market value. See also *In re Crane*, 34 N. Y. S. (2d) 9, 15; *In re Wacht's Estate*, 32 N. Y. S. (2d) 871, 895; *Anderson* v. *Hinrichs*, 42 N. Y. S. (2d) 610.

In *Claude R. Branch*, 40 B. T. A. 1044, affd. (C. C. A., 1st Cir.), 114 Fed. (2d) 985, the Board considered a trust created by the tax-

payer for the benefit of his wife. There the Commissioner contended that the taxpayer by virtue of the trust provisions had "complete direct control over the trust corpus." The Board held against the Commissioner, its opinion reading in part as follows, p. 1050:

This argument is inconclusive. The trustees are under a legal duty to protect and conserve the trust assets. In the administration of trust estates it is a well established rule of law that "A trustee must use the same care for the safety of the trust fund, and for the interests of the *cestui que trust*. that he uses for his own property and interests." Perry on Trusts and Trustees, 7th Ed., vol. I, § 441. "The first care of the law is the safety of the trust fund. Upon this truism depends every rule which has been made for the conduct of the trustees." *In re Union Trust Co. of New York*, 149 N. Y. S. 324.

＊　　　＊　　　＊　　　＊　　　＊　　　＊　　　＊

It is clear from the trust agreement that the petitioner's reserved powers over the trust corpus to which the respondent refers. such as to invest. sell. or exchange the securities held by the trustees, were to be exercised by him as trustee and not as grantor of the trust. The fact that in the exercise of such powers the petitioner could act alone and without the concurrence of the other trustees was not detrimental to the trust. In no event could he have appropriated any of the trust funds to his own use without violating his trust. Again we must assume that the petitioner's acts as trustee would have been for the best interests of the trust.

Nor do we find any authority in the present trust indentures for the trustee to sell. exchange, mortgage. lease or otherwise dispose of the property of the trust upon other than proper terms and conditions, i. e., terms and conditions under which a fiduciary could properly act. If a transaction was otherwise proper the fact that the original trustee acted in both his individual and his representative capacity would not invalidate it. But this provision clearly would not relieve the grantor-trustee "from obedience to the great principles of equity which are the life of every trust"; when he made himself a trustee the grantor subjected himself to those obligations of fidelity and diligence that attach to the office of trustee. *Carrier* v. *Carrier*, *supra*. "All profits and every advantage beyond fiduciary's lawful compensation which come to fiduciary are for benefit of his cestui que trust." *Lonsdale* v. *Speyer*, 291 N. Y. S. 495.

The Supreme Court considered similar language and powers in refusing to tax the income of a short term trust to the grantor-trustee in *Helvering* v. *Wood*, 309 U. S. 344. In that case the grantor retained no power of revocation or power to revest the trust corpus in himself prior to the end of the trust term, although at the end of the term such property reverted to him. The Supreme Court, in refusing to apply section 166. pointed out that the Commissioner had not undertaken to establish that under New York law, which governed the trust, the taxpayer had the power to revoke; that Congress drafted section 166 having in mind the distinction between revocable trusts

and reversions under short term trusts; that, generally speaking, the power to revest or to revoke an existing estate is discretionary; that the interpretation of section 166 is narrowly confined to a limited class; and that in applying section 166 there is no wide range for definition or specification as there is in applying section 22 (a).

Here, as in the *Wood* case, *supra*, the law of New York governs the trusts. *Helvering* v. *Stuart*, 317 U. S. 154. The petitioners have shown that under New York law the powers given the trustee by the grantor could be used only for the benefit of the *cestui que trust*. Any use of his fiduciary powers to manage, invest and reinvest the trust corpus or to sell, exchange, mortgage, lease, or otherwise dispose of trust property for the fiduciary's personal benefit would be such an abuse of the trustee's obligations and duties to the beneficiaries that we can not read into the specific powers any implied power to revoke the trust. We should not interpret these powers so as to impute malfeasance to the trustee. *Helvering* v. *McCormick* (C. C. A., 2d Cir.), 135 Fed. (2d) 294, 297. There being no power to revoke, no occasion to apply section 166 exists, and on this point petitioners must prevail.

Respondent's second contention is that the income of these trusts is taxable to grantor under section 22 (a), *supra*. He relies particularly upon *Helvering* v. *Clifford*, 309 U. S. 331, and related cases. The *Clifford* case was decided upon its own particular facts, as the Supreme Court was careful to point out, but it laid down the principles which respondent here seeks to apply. In discussing these principles the Supreme Court said, "In this case we cannot conclude as a matter of law that respondent ceased to be the owner of the corpus after the trust was created. Rather the short duration of the trust, the fact that the wife was the beneficiary, and the retention of control over the corpus by respondent all lead irresistibly to the conclusion that respondent continued to be the owner for purposes of § 22 (a)."

Respondent's contention that the grantor retained substantially the same control after the trusts as before has of course many facets, the principal ones of which are that his broad powers of management and investment were exercisable in his sole discretion, without any personal liability for losses incurred; that he could redistribute the income within the family group; and that he could effectually revoke the trusts through his power to purchase the trust corpus at his own price. It is true that under the trust indentures the petitioner, as trustee, did have broad powers in managing the trust, but those powers, particularly when considered in connection with certain restricting provisions and factual circumstances, are not in our opinion sufficient to bring this case within the rule of *Helvering* v. *Clifford*, *supra*, as the respondent contends. A trustee can not administer a trust to his personal advantage. We find no authority in the present instruments

whereby the grantor could redistribute the trust income; the original disposition was final and irrevocable. The beneficiaries were not within his immediate family group, but were adults who had their own families, except for the son, who had been married and divorced. It can not be said therefore that this was merely a temporary reallocation of family income among the members of an intimate family group. The grantor was under no obligation to support any of the beneficiaries, and he was relieved of no obligation by the distribution of the trust income. We have heretofore considered and rejected the contention that the grantor could effect a revocation of the trusts under the broad powers granted to himself as trustee, and we deem further comment unnecessary.

Viewing all the relevant factors and surrounding circumstances, together with the legal interests and rights created, we are not persuaded that the control exercised or that could be exercised by the grantor-trustee herein was such control and ownership as to make the income of these trusts taxable to him under section 22 (a). Cases dealing with alimony trusts, trusts for the maintenance of minor children, trusts for the payment of insurance premiums, and the like, have been considered, but, since in our opinion such cases are factually distinguishable, they have not been cited.

With respect to decedent's right to deduct commissions paid during 1937, the stipulated facts merely show that he paid $17,207.07 as commissions on sales of securities and commodities. Such deductions are allowable only to a dealer in securities and commodities. *Spreckels v. Commissioner*, 315 U. S. 626. In the absence of proof that decedent was a dealer in securities, this issue must be decided in favor of the respondent. *Frank G. Hoover*, 42 B. T. A. 786, 792.

Reviewed by the Court.

*Decision will be entered under Rule 50.*